Douglas E. YEO, Individually and on Behalf of His Children and as Chairman of the Lexington Parents Information Network, Plaintiff, Appellant,

v.

TOWN OF LEXINGTON, Jeffrey Young, Superintendent, David Wilson, Principal, Samuel Kafrissen, Karen Mechem and Joseph Dini, Chairman, John Oberteuffer, Lois Coit, Susan Elberger and Barrie Peltz, Individually and as They Are Members of the Lexington School Committee, Defendants, Appellees.

No. 96–1623.

United States Court of Appeals, First Circuit.

Heard Nov. 7, 1997.

Decided Dec. 9, 1997.

John W. Spillane, with whom John J. Spillane, Worcester, MA, and Gregory D. Smith, Clarksville, TN, were on brief for appellant.

Adam P. Forman, with whom Lois Brommer Duquette, Sarah A. Olivier, and Testa, Hurwitz & Thibeault, LLP, Boston, MA, were on brief for appellees.

S. Mark Goodman, Michael C. Hiestand, Arlington, VA, Robert A. Bertsche, and Hill & Barlow, Boston, MA, for the Student Press Law Center, National Scholastic Press Association, Journalism Education Association, Scholastic Journalism Division of the Association for Education in Journalism and Mass Communication, Columbia Scholastic Press Advisers Association, New England Scholastic Press Association, and Yankee Press Education Network; Dwight G. Duncan, North Dartmouth, MA, for the Massachusetts Family Institute; James C. Heigham, and Choate, Hall & Stewart, Boston, MA, for Massachusetts Newspaper Publishers Association; Gwendolyn H. Gregory, Alexandria, VA, Melinda L. Selbee, Lombard, IL, Timothy B. Dyk, Washington, DC, John Bukey, Corona, CA, Jones, Day, Reavis & Pogue for the National School Boards Association, Illinois Association of School Boards, and California School Boards Association's Educational Legal Alliance; Michael J. Long, Rosann DiPietro, and Long & Long for the Massachusetts Association of School Superintendents, on briefs amici curiae.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, SELYA, BOUDIN, STAHL, and LYNCH, Circuit Judges.

## OPINION EN BANC

LYNCH, Circuit Judge.

This case, involving speech interests on both sides, arises from the decision of two public high school student publications—the newspaper and yearbook—not to publish an advertisement. The advertisement promoted sexual abstinence and was proffered by a parent, Douglas Yeo, in the aftermath of a decision by the Lexington, Massachusetts School Committee to make condoms available to students as a public health matter. Yeo had campaigned against the condom distribution policy and lost. The two high school student publications declined to publish the advertisement on the grounds that each had a policy, albeit unwritten, of not running political or advocacy advertisements.

The civil rights action brought by Yeo against the Town, the School Committee, Superintendent and school officials was terminated on defendants' motion for summary judgment. The district court judge concluded that no state action had been shown. A panel of this court, this judge dissenting, reversed, holding that summary judgment should be entered for Yeo on his claims that there was state action, that each student publication was a public forum, and that the

decisions not to publish were impermissible view point discrimination. 1997 WL 292173 (1st Cir. June 6, 1997). This court granted en banc review[1] and withdrew the panel opinion. The en banc court now affirms the decision of the district court entering summary judgment for defendants on the ground that state action has not been shown.

## I. The Facts

We review the facts in the light most favorable to Yeo, the party opposing summary judgment, drawing all reasonable inferences from the record in his favor. *Swain v. Spinney*, 117 F.3d 1, 2 (1st Cir.1997).

### A. *The Publications*

This case involves two distinct Lexington High School (LHS) student publications, the LHS Yearbook and the LHS *Musket*. The Yearbook was operated entirely by a staff of about sixty students; all editorial, business, and staffing decisions were made by students. During the 1993–94 academic year, this staff was headed by two co-editors-in-chief, Dow–Chung Chi and Natalie Berger. Karen Mechem, a LHS teacher, was the Yearbook faculty advisor. Mechem was paid a stipend of less than $2,000 for that activity. Apart from Mechem's stipend and the use of LHS buildings and facilities, the Yearbook is financially independent from the school and is funded entirely through the sale of the books to students and advertising.

Like most yearbooks, the LHS Yearbook included pictures of seniors and other students, sections on sports, academics, and activities, and an advertisement section. This advertisement section was largely comprised of congratulatory or commemorative ads purchased by students and their families. As the Yearbook advertising order form suggested, student ads might include "[b]aby pictures, group photos taken in the setting of your choice, [or] pictures of meaningful people and/or places." A few advertisements were also sold to local businesses; most of these included congratulatory messages to the graduating class.

During the 1993–94 academic year, the Yearbook's unwritten policy was to publish advertisements from those local businesses which the students frequented or had some relationship with during their high school years. In keeping with this policy, students selling ads targeted those businesses that fit the Yearbook theme of fond memories. The Yearbook's policy was not to publish any political or advocacy advertising, including ads from candidates for student government.[2] The purposes of this policy were to ensure that the advertising section of the Yearbook was congruent with the rest of the publication and to prevent the Yearbook from becoming a bulletin board for competing issue groups or candidates in a way that would interfere with the commemorative purpose of the Yearbook.

The LHS *Musket* is a student-written and edited newspaper that is published four or five times a year. All editorial, operational, and staffing decisions are made by the student editors. During the 1993–94 academic year, Ivan Chan served as the *Musket*'s editor-in-chief, Dong Shen was the business manager, and Samuel Kafrissen was the faculty advisor. Students do not seek or obtain the approval of the faculty advisor for any

1. The court acknowledges the assistance provided in the briefs amici curiae filed by the: National School Boards Association, Illinois Association of School Boards, and California School Boards Association's Educational Legal Alliance; Massachusetts Newspaper Publishers Association; Massachusetts Family Institute; Massachusetts Association of School Superintendents; Student Press Law Center, National Scholastic Press Association, Journalism Education Association, Scholastic Journalism Division of the Association for Education in Journalism and Mass Communication, Columbia Scholastic Press Advisers Association, New England Scholastic Press Association, and Yankee Press Education Network.

2. The record does not reveal whether political or advocacy advertising other than the ad giving rise to this litigation was ever submitted to the Yearbook or the *Musket*. However, those affiliated with the Yearbook and the *Musket* believe that neither has ever published a political or advocacy message or accepted an advertisement from a political or advocacy organization. Yeo offers no evidence to the contrary, and the record, which contains the advertising sections of several Yearbooks, bears out defendants' description of the types of congratulatory advertising printed. No evidence was produced that the *Musket* had ever printed a political or advocacy advertisement.

editorial or operational decisions. Kafrissen is paid a stipend of $1,373 by LHS, and the *Musket* receives about $4,500 a year from the School Committee. The *Musket* has no physical facilities at LHS, other than a mail box; all the layout is done at editors' homes. The *Musket* typically includes news articles about the high school, features, editorials, letters to the editor, sports coverage, and humor columns, all written, edited, and produced by students. The *Musket* is described in literature distributed to the student body as being a "student run newspaper" which is "written, edited and distributed by students." The editorial page bears a legend stating expressly that the opinions stated there are those of the student editors or newspaper staff and not of school policy.

Not every issue of the *Musket* contains advertising. Those that do contain two or three small ads from businesses that cater to student tastes. During the 1990s, those advertisers have included a bookstore, a video store, a music store, a driving school, a deli, a hair salon, SAT prep courses, and, around prom time, a tuxedo rental store and a dress shop. For the 1993–94 school year, the *Musket* created an "Advertisement Form" for potential advertisers. The form stated that: "The award winning Lexington High School student newspaper provides area businesses and non-profit organizations the opportunity to place advertisements in the *Musket*." The form did not state that ads were subject to editorial approval, although it did note that, depending on the issue, ad size might have to be adjusted and ads might have to be edited, by the paper's staff, for length. The form also stated that "[p]ayment ... for an ad will occur only *if* and after we publish an ad." (emphasis added).

Pursuant to an unwritten policy, the *Musket* has never accepted advocacy or political advertising, including that from candidates for student government. The purpose of this policy was to prevent the *Musket* from becoming a "bulletin board" for warring political ideas. The students also rejected the idea of allowing cigarette ads in the paper for fear that such advertising would be read as an endorsement of smoking.

## B. *Yeo's Submission of Advertisements*

In 1992, the Lexington School Committee adopted a policy making condoms available to students at LHS without parental permission. This measure was the subject of political controversy in Lexington, and Douglas Yeo, a town resident and parent, emerged as a leading opponent of condom distribution and other "safe sex" policies. Yeo headed a group called "Lexington Citizens for Responsible School Policy," which sponsored a nonbinding town-wide referendum on the School Committee's condom policy.

The *Musket* ran both news articles and editorials on the policy and the referendum. Yeo thought these articles misrepresented his group's position. In January 1993, Yeo requested a meeting with LHS Principal David Wilson concerning his grievance. Wilson suggested that Yeo submit a letter to the editor correcting the alleged inaccuracies, but advised Yeo that any decisions regarding corrections would have to be made by the student editors. Yeo did not contact the student editors. In March 1993, the voters of Lexington approved the condom distribution policy.

Subsequently, in May 1993, Yeo founded the Lexington Parents Information Network ("LEXNET"). LEXNET's stated goal was to distribute information about public education to parents via newsletters and meetings.

### 1. *The Yearbook Ad*

On November 1, 1993, Yeo, as Chairman of LEXNET, submitted a full page ad to the 1994 LHS Yearbook. The ad copy read:

We know you can do it!

ABSTINENCE: The Healthy Choice

Sponsored by: Lexington Parents Information Network(LEXNET)

Post Office Box 513, Lexington Massachusetts 02173.

The ad was accompanied by a check for $200.00.

Mechem, the Yearbook advisor, acknowledged receipt of the check and placed the ad

in a drawer without giving it a second thought. In keeping with Yearbook procedures, the LEXNET ad was "warehoused" in a drawer with other ads pending submission to the publisher for the printing of proofs. Natalie Berger, a senior and co-editor-in-chief, noticed the ad in the drawer and felt that the ad was "out of context" with the advertising section of the Yearbook. However, she decided to postpone a publication decision until she saw the ad in proof form, which was typically when critical editorial decisions were made.

In January 1994, a large number of proofs, including those of Yeo's ad, came back from the printer. All the student editors attended an editorial meeting at which they looked over the various ads and copy. After much discussion, the editors decided that Yeo's ad was a political advocacy statement that was out of context with the rest of the Yearbook and that had no place in that publication. Although the students decided to reject the ad as drafted, they still wished to include a message from LEXNET if the ad could be rewritten to conform with the rest of the Yearbook. The students did not consult with Mechem or any other member of the faculty or administration prior to making this decision.

The Yearbook editors asked Mechem to notify Yeo of their decision. The students also asked Mechem to convey their request that Yeo's ad be revised to express a congratulatory graduation message. On February 1, 1994, Mechem called Yeo, and told him that the students would like to have the ad rewritten. Yeo refused to revise the ad and threatened to sue the Yearbook unless his ad was published as submitted.

The student editors discussed the issue again, and decided to stand by their original decision to reject Yeo's ad. They asked Mechem to write to Yeo, returning his check. On February 4, Mechem wrote to Yeo:

> Because of the non-controversial nature of the advertising section of the yearbook, we have decided not to print the advertising you have submitted. Please accept my apologies for the inconvenience that our reviewing procedure may have caused.

A $200 check was enclosed. Mechem told Principal Wilson about Yeo's ad and the students' decision to reject it.

Yeo replied by fax on February 13, 1994, writing:

> Based on our understanding of the right of equal access and free speech, we do not accept your rejection of our ad and ask that you reconsider your decision to censor it. We will not be cashing your check at this time.
>
> Should you not reverse your decision, we will avail ourselves of every possible avenue open to us in order to protect our rights as advertisers.

### 2. *The Musket Ad*

On January 3, 1994, Yeo wrote to Dong Shen, a senior and the business manager of the *Musket,* requesting information about advertising procedures and rates. The letter was not on LEXNET stationary and did not identify Yeo as a member of that group. Receiving no reply, Yeo wrote to Shen again on January 20, requesting the information "as soon as possible," and copying Ivan Chan, the editor-in-chief, on the letter.

On January 25, Shen wrote to Yeo, providing the requested information and taking full personal responsibility for the delayed response. Shen concluded by noting, "Of course ads are still subject to the approval of the editorial board."

On February 1, 1994, Yeo submitted an ad to the *Musket.* The text was identical to the Yearbook ad previously submitted, except that, above LEXNET's address, it contained the line: "For accurate information on abstinence, safer sex and condoms, contact:[LEXNET]."

The student editors of the *Musket* discussed the ad extensively. In mid-February, they met and decided that Yeo's ad constituted a political statement that they would not run as a matter of policy. On February 24, 1994, Shen wrote to Yeo:

> After careful consideration of your advertisement from LEXNET, the Musket came to the difficult decision of not printing it. In no way did we want to limit your right to express your opinion, but we could not

accept a political statement as an advertisement. Our own advertisement policy dictates so for good reasons. If we were to accept a politically aligned advertisement, we at the Musket would feel obligated to accept other political statements that might come our way. We do not wish to put ourselves in such position. Ultimately Ad space is not a public forum and for that reason the Musket reserves the right to select what Advertisements it chooses to print. If you have any question feel free to contact the Musket.

The decision was made, and the reply written, by the student editors without consulting Kafrissen, the *Musket* faculty advisor, or requesting his, or any other adult's, approval. In fact, Kafrissen did not even know about the ad's submission until the time of the editorial meeting, and did not see the ad or the students' response until after the reply had been sent.

Sometime the next week, Principal Wilson called Kafrissen and informed him that Lexington's Town Counsel, Norman Cohen, had been contacted by Yeo's lawyer; the lawyer had threatened to sue the town and the school authorities if the ad was not run. Cohen thought that it would be best to avoid a lawsuit and requested that the students publish Yeo's ad. Kafrissen and Wilson agreed to look into the legal issues in greater depth and to discuss the matter with the students.

On March 1, 1994, the student editors of the *Musket* met with Kafrissen. Kafrissen informed them of Yeo's actions. Although a number of students at the March 1 meeting supported Yeo's pro-abstinence views, they were concerned that the *Musket* might turn into a bulletin board for advocacy on lifestyle issues. Additionally, the students were uncomfortable with having to run an ad because someone had threatened to sue them if they did not. The editors once again decided to reject the ad. They asked Kafrissen to contact Yeo and to invite him to present his views in a "letter to the editor."

Kafrissen, on behalf of the *Musket*, wrote to Yeo that day. In the letter, Kafrissen suggested that Yeo write a letter to the editor:

We have long considered the Letters to the Editor section of the Musket to be a public forum. Historically we have accepted and printed on these pages any and all "short and tasteful" letters that have come to us. We would welcome such a letter from your organization in which you would probably be able to explicate your position on abstinence more fully than you would be able to in an ad format. We have heard that you feel that school publications have prevented you from presenting your message to the student body. Therefore we suggest that you use the medium of a letter to get your message across in greater detail, and without charge.

The letter concluded by noting that, if Yeo were successful in forcing the *Musket* to print the ad, this would have the negative consequence of removing editorial control from the student staff.

Yeo declined the offer on March 7 in a letter to Kafrissen. In that letter, Yeo explained that his organization decided to sponsor the ads for two reasons:

Firstly, we had a simple message we wanted to get out that would affirm abstinent students in the LHS community.... There is nothing controversial or political in our message. Secondly, I wanted to see if the *Musket* and Yearbook would react as I thought they would. They did. In spades.

Accordingly, Yeo declined to write a letter to the editor, which, he felt, could not make the point as concisely as an ad could. Yeo insisted that the ad be run as submitted, "as is our legal right," and concluded, "You don't have to agree with it. You don't even have to like it. You just have to print it. Touché."

## C. *The Administration's Response and the Students' Decisions*

On March 1, Yeo met with Principal Wilson to discuss the ads. Yeo believes that, at that meeting, Wilson assured him that the ads would be printed, and told him that the Town Attorney had advised publication.

Meanwhile, as the controversy heightened, the students and faculty alike were seeking advice from various sources. Mechem told

Wilson that Dow–Chung Chi, the Yearbook's co-editor-in-chief, had asked her: "If we don't print the ad, what law are we breaking?" In an attempt to answer his question, Mechem talked with Wilson, Kafrissen, and the Student Press Law Center in Washington, D.C. Several of the student editors of the *Musket* and the Yearbook sought advice from the Student Press Law Center and the Civil Liberties Union of Massachusetts, as well as from attorneys they knew personally. The students were told by these various sources that, under the federal Constitution and Massachusetts law, student editors had the right to decide what was printed in their publications.

On March 11, 1994, LHS officials and student editors met in the office of the Superintendent of Schools, Jeffrey Young. Yearbook editors-in-chief Berger and Chi, *Musket* editor-in-chief Chan, advisors Kafrissen and Mechem, Superintendent Young and Principal Wilson attended. Young asked questions to determine what the students' reasoning was, and to determine that they had engaged in a thoughtful process prior to the meeting. The administrators and faculty were impressed with the way the students outlined the issues. Young concluded by stating that he would like to do further research and to obtain legal advice.

In mid-March, *Musket* editor-in-chief Chan was approached by a group of students who were offended by Yeo's efforts and who wished to place a "counter ad" in the *Musket.* The proposed ad looked exactly like Yeo's ad except that, in place of "Abstinence: The Healthy Choice," it read "Safe Sex: The Healthy Choice." Chan decided to reject the counter-ad, and informed the staff that it would not be published.

On March 13, Chan called a meeting of the entire *Musket* staff; Kafrissen was not invited and did not attend. At that meeting, Chan briefed the students on the events surrounding the submission of Yeo's ad. The student staff unanimously opposed publication of Yeo's ad.

On March 18, a second meeting was held in Superintendent Young's office. In addition to the prior participants, Lexington School Committee members attended. (LHS Assistant Principal Lawrence Robinson attended in Principal Wilson's stead). The *Musket* and Yearbook editors reiterated their refusal to run Yeo's ads. The school officials and School Committee members warned the students of the possible consequences of their decision, including litigation, and described the potentially unpleasant media exposure the students could expect. Although the students felt that the school officials wanted them to print the ads, the officials maintained that it was the students' decision to make. The students were repeatedly advised that the ultimate decision about publication of the advertisement was theirs to make and the school administration would stand by their decision.

Following the March 18th meeting, Chan held several further discussions with individuals and groups from the *Musket*'s staff. Finally, with the staff's support, Chan conclusively decided not to run Yeo's ad as a matter of policy.

On April 11, 1994, the Superintendent again met with the Musket staff and again told them the decision was theirs. Throughout Young's tenure as Superintendent, the Musket has been operated as an independent student-run newspaper and he has never authorized any school official to interfere with the students' decision on what to publish. Yeo offers no evidence to the contrary.

As for the Yearbook, Chi and Berger asked Mechem to invite Yeo, on the students' behalf, to a meeting at which alternatives could be discussed. Yeo wrote to Mechem on March 28, informing her that, on the advice of counsel, he would not be able to meet with the student editors, and requesting that all further inquiries be addressed to his lawyer at the Rutherford Institute in Virginia.

Berger then called a meeting of all the Yearbook section editors. Mechem attended the beginning of the meeting and urged the students to consider the school officials' advice. Mechem then left the meeting. The students discussed the issues raised at the March 18 meeting. The students reaffirmed

their decision to reject Yeo's ad. Chi and Berger then drafted a memo to Superintendent Young and the School Committee. It concluded:

> After much discussion and deliberation, the reasons for our decision are as follows. The nature of the advertisement, which promotes a style of life, regardless of the message, does not coincide with that of the rest of the advertisement section of the yearbook. The inclusion of this type of advertisement would also establish an unsuitable precedent for the future of the yearbook.

This litigation followed.

During the 1994–95 school year, the new student editors of the Yearbook decided not to accept any advertisements other than personal notes from parents and students. Yeo resubmitted his ad in September 1994, but it was rejected under the new policy. The 1994–95 *Musket* staff drafted explicit "Advertisement Policies and Procedures," to be distributed with advertisement forms, which states the type of advertisements, including those from "political organizations, referendum issues, advocacy groups, [and] public service organizations," that the *Musket* will not print.

The newspaper in its news pages gave extensive coverage to the controversy between it and Yeo, thus providing Yeo with coverage of his pro-abstinence position.

## II. Procedural History

Yeo's action under 42 U.S.C. § 1983 alleges that the refusal of the two publications to print the advertisements violated his rights to free speech and equal protection under the U.S. Constitution and Art. 16 of the Massachusetts Declaration of Rights. Yeo sued the Town, School Committee, Superintendent, Principal, and faculty advisers but did not name the students as defendants.

The defendants moved for summary judgment on various grounds, including, inter alia, the lack of state action, that no public forum had been created, and qualified immunity. Yeo opposed summary judgment, but did not submit a statement of disputed facts in opposition to summary judgment as required by Local Rule 56.1 of the District of Massachusetts. Yeo conceded at his deposition that he had no personal knowledge of the decision making processes followed by the Yearbook and the newspaper in rejecting his advertisement. The district court granted summary judgment on the state action issue without reaching the other issues. We affirm on the same ground.

## III. State Action

The essential state action inquiry is whether the government has been sufficiently involved in the challenged actions that it can be deemed responsible for the plaintiff's claimed injury.[3] If there is no state action, then the court may not impose constitutional obligations on (and thus restrict the freedom

---

3. The 'under color of law' requirement of § 1983 "has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment," *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1156–57 n. 7, 16 L.Ed.2d 267 (1966). Indeed, the Supreme Court has reversed an appellate court which treated the two analyses as separate. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924, 928, 929, 102 S.Ct. 2744, 2746–47, 2749, 2749–50, 73 L.Ed.2d 482 (1982). This court has consistently treated the analyses as the same. See *Barrios–Velazquez v. Asociacion de Empleados*, 84 F.3d 487, 490–491 (1st Cir.1996). Where the statutory and constitutional inquiries are inextricably intertwined, decision of the state action question is hardly a breach of the obligation to decide cases on statutory grounds in order to avoid constitutional questions. We do not engage in a separate § 1983 analysis, nor do we reach the issue of municipal liability, under *Monell v. De-*

*partment of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), or of qualified immunity claimed by the individual defendants. The district court ruling did not reach any of these issues. Judge Stahl's concurrence suggests that we leap over the question of state action to address a statutory issue of causation, an unusual approach. The question whether Yeo even has a First Amendment right to assert depends on whether there is state action. The Supreme Court and the circuit court cases described above have consistently addressed the state action question before addressing questions of causation. *See also Polk County v. Dodson*, 454 U.S. 312, 325, 102 S.Ct. 445, 453–54, 70 L.Ed.2d 509 (1981) (examining § 1983 defense of no municipal custom only after examining state action issue). Further, courts ordinarily address questions of jurisdiction first, and the presence of state action is "a jurisdictional requisite for a § 1983 action." *Id.* at 315, 102 S.Ct. at 448.

of) private actors.[4]

This is a situation in which the government actors—the school officials acting under a statute [5] of the Commonwealth of Massachusetts—have chosen to grant editorial autonomy to these high school students. The state action analysis is thus placed squarely in a very complex and changing area of law.

The modern state action decisions of the Supreme Court do not rely on a single analytic model applied regardless of the fact patterns involved. As this Court once observed, the "state action inquiry is 'necessarily fact-bound.'" *Ponce v. Basketball Federation of the Commonwealth of Puerto Rico*, 760 F.2d 375, 377 (1st Cir.1985) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2754–55, 73 L.Ed.2d 482 (1982)). The analytic model used must take account of the specific constitutional claim being asserted, here, one under the First Amendment.[6] *Cf. Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (state action inquiry shifts depending on constitutional question asked). "Faithful adherence to the 'state action' requirement ... requires careful attention to the gravamen of the plaintiff's complaint." *Blum v. Yaretsky*, 457 U.S. 991, 1003, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). As the Supreme Court has noted:

> We recognize that the First Amendment, the terms of which apply to governmental action, ordinarily does not itself throw into constitutional doubt the decisions of private citizens to permit, or to restrict, speech—and this is so *ordinarily* even where those decisions take place within the framework of a regulatory regime....

*Denver Area Telecomm. Consortium, Inc. v. Federal Communications Comm'n*, —— U.S. ——, ——, 116 S.Ct. 2374, 2383, 135 L.Ed.2d 888 (1996).

The state action issue implicates a myriad of players, only some of whom are defendants. Yeo sued only those individuals who are public school administrators, teachers, or members of the Lexington School Committee. They are concededly state actors. He did not sue the student editors. But the "action" of which Yeo complains was an action taken by the students. The "actions" he assails were the editorial judgments not to publish his advertisement. Those judgments were made by the students, who are not parties.

There are expressive interests involved on both sides of this case. Yeo's are obvious. Those on the other side are perhaps less obvious. The identification of these interests puts the state action question in context.

If the actions by the students are themselves state action or may be attributed to the school officials and provide the basis for state action, the inevitable legal consequence will be some level of judicial scrutiny of the

---

**4.** *See, e.g., Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619–20, 111 S.Ct. 2077, 2082–83, 114 L.Ed.2d 660 (1991) (discussing the relevance of the "state action" requirement to private freedom).

**5.** Mass. Gen. Laws ch. 71 § 82 provides, in pertinent part:

> The right of students to freedom of expression in the public schools of the commonwealth shall not be abridged, provided that such right shall not cause any disruption or disorder within the school. Freedom of expression shall include without limitation, the rights and responsibilities of students, collectively and individually, ... to write, publish and disseminate their views.... No expression made by students in the exercise of such rights shall be deemed to be an expression of school policy and no school officials shall be held responsible in any civil or criminal action for any expression made or published by the students.

Mass. Gen. Laws ch. 71, § 82; *see also Pyle v. School Comm.*, 423 Mass. 283, 667 N.E.2d 869 (1996) (holding that the statute protects even vulgar speech so long as no disruption or disorder results). We express no view on whether state law would have permitted the school to override the students' decisions. As we explain, the state's student speech law may be a factor in the state action inquiry, but the issue for us is ultimately one of federal constitutional law.

**6.** The "search for state action ... ends by identifying the precise substantive constitutional issue to be addressed." Tribe, *American Constitutional Law* § 18-6, at 1715 (2d ed.1988). *See also* 1 Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 2.04, at 63 (3d ed. 1991)("[S]tate action is not a unitary concept, but varies depending on the constitutional violation asserted.").

students' editorial judgments.[7] The inevitable practical consequence will be greater official control of the students' editorial judgments. Both consequences implicate the students' First Amendment interests, which are far from negligible. *Cf. Hazelwood Sch. District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (acknowledging but ruling against student speech interests when school officials overrode students' editorial judgments and withdrew certain material from pages of high school newspaper); *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 252, 94 S.Ct. 2831, 2836–37, 41 L.Ed.2d 730 (1974) ("[I]mplementation of a remedy such as [government] enforced access" to pages of a private newspaper "brings about a confrontation with the express provisions of the First Amendment and the judicial gloss on that Amendment developed over the years.").

In addition, the defendant school officials themselves have an interest in their autonomy to make educational decisions. The officials have determined that the best way to teach journalism skills is to respect in the students' editorial judgments a degree of autonomy similar to that exercised by professional journalists. That choice by the officials parallels the allocation of responsibility for editorial judgments made by the First Amendment itself. The Supreme Court has "oft expressed [the] view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood,* 484 U.S. at 272, 108 S.Ct. at 571.

The leading Supreme Court decisions concerning high schools and students are all meaningfully different from this case, and thus provide little guidance on the state action question. Each of those cases involved a claim by students that the actions of public school administrators violated their constitutional rights. For example, in *Hazelwood,* plaintiff students contended that officials violated the First Amendment by deleting articles from student newspaper. State action was simply not at issue in *Hazelwood* because the relevant actions were admittedly taken by public school officials.[8] *Id.,* 484 U.S. at 264, 108 S.Ct. at 566. The same is true of earlier decisions, all of which involve student claims against those running the schools. *Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)(civil rights claim by student disciplined by officials for language used in school assembly); *Tinker v. Des Moines Indep. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)(student claim that principals' regulation against armbands violated First Amendment); *see also Vernonia Sch. Dist. v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)(student Fourth Amendment claim against school district). Here, in contrast, the question is whether the actions by *students* may fairly lead to a conclusion there is state action.

Each court of appeals which has considered the state action requirement in the context of attempts to attribute student-controlled editorial decisions in public institutions of higher education to public officials has found no state action. In *Leeds v. Meltz,* 85 F.3d 51 (2d Cir.1996), the court found no state action where school officials and students were sued over the decision by student editors of a newspaper in a state-supported law school to reject an ad. *See id.* at 55. In *Sinn v. The Daily Nebraskan,* 829 F.2d 662, 665 (8th Cir.1987), the court held that there was no state action in the refusal to print an ad where the student paper "maintains its editorial freedom from the state." In *Mississippi Gay Alliance v. Goudelock,* 536 F.2d 1073, 1075 (5th Cir.

7. We do not accept the suggestion of Judge Stahl's concurrence that the students are private actors with respect to reporting and editorializing and that they are not with respect to the advertising decisions. Whatever role such a distinction may play in a limited public forum analysis, the distinction offers little assistance here.

8. Thus, when the Supreme Court in *Hazelwood* discusses whether "school-sponsored publications that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," 484 U.S. at 271, 108 S.Ct. at 570, that discussion was pertinent to whether there was an intent to create a public forum. *Hazelwood* did not create a new state action analysis that any school sponsored activity which bears an imprimatur of the school thus constitutes state action.

1976), a similar result was reached in a suit against the newspaper editor where the students elected the editor and university officials did not control or supervise editorial judgment about what to publish. In *Avins v. Rutgers,* 385 F.2d 151, 153–54 (3d Cir. 1967), without expressly discussing the state action issue, the court held that a state-supported law review's rejection of an article did not violate the First Amendment because editorial discretion is a necessary component of publishing a journal. Yeo argues that cases involving public universities are not on point, given the state's potentially greater role in controlling the behavior of younger, high school students. But it is also true that the autonomy given to these high school students renders them more like their older counterparts and renders those cases highly relevant.

The only decisions we have found which assume there is state action do so where the parties agreed there was state action and it was undeniable the decision makers were government officials. The decision by the Ninth Circuit in *Planned Parenthood of Southern Nevada Inc. v. Clark County School District,* 941 F.2d 817 (9th Cir.1991), is inapposite as state action was conceded. There the school officials themselves controlled the school publications and decided to reject the advertisement from the plaintiff organization. *Id.* at 820. Likewise, in *Lee v. Board of Regents,* 441 F.2d 1257 (7th Cir. 1971), state action was conceded where the student newspaper was a "state facility".

While all parties appropriately point us toward the state action analysis in *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764,

73 L.Ed.2d 418 (1982), that case is rather the mirror of this. *Rendell–Baker* involved a claim that private school officials were state actors. Here the claim is that public school officials may be sued based on the actions of students. The students are themselves at least facially private actors.

The theories for (and against) state action basically devolve here into three categories of analysis. First, is there state action because the decisions not to publish were actually made by or controlled by the school officials? (Even if the decisions were not directly made by the school officials, those officials, Yeo argues, exerted such influence as effectively to determine the outcome of the student decisions.) This is primarily a factual question.

Second, even if the state did not actively direct or control the decisions, was the state required to intervene, and to do so in such a way as to provide a basis for a state action finding? This is primarily an issue of law.

Third, even if the decisions were made independently by the students, may the decisions of the students fairly be attributable to the school officials because of the public school setting? The material facts are undisputed; the question is what conclusion to draw from these facts. We take each argument in turn.

### A.

Yeo argues that the decisions were made or controlled in fact by the school officials, but the record does not support that conclusion.[9] The students and each of the involved

---

9. Yeo calls our attention to the fact that the advisors authored some of the correspondence, using the term "we," and to the fact that, on a separate occasion, Kafrissen threatened to resign if the students did not take his advice. It is true that Kafrissen and Mechem used the word "we" in letters to Yeo. However, the letter from Kafrissen was written *after* Dong Shen had already communicated the students' rejection of the ad to Yeo. As for Mechem's correspondence, Mechem and the Yearbook editor both stated unequivocally that the decision was made by the students prior to consultation with Mechem, and that Mechem wrote to Yeo at the student editors' request. As to Kafrissen's threat to resign, the incident only serves to illustrate that Kafrissen did not believe he had the authority to order the

students around. His actual description of the incident is as follows:

> I have never ordered (nor do I have the authority to order) the student editors not to run an editorial, news or feature article or any advertisement. I have used persuasion to address matters that seemed over-the-line. On one occasion, for example, when I disagreed strongly with a proposed student editorial, which, in my opinion, took an extremely irresponsible position, I was prepared to resign if my advice to withdraw the editorial was not accepted. The editors engaged in an extensive debate and consulted with their parents before finally agreeing to withdraw the editorial.

school officials say that the students, and not the school officials, made the decision. Yeo has offered nothing to contradict that.

■ Nonetheless, the state action cases recognize that government should not be shielded when it is the real actor behind the scenes or when it joins in a charade designed to evade constitutional prohibitions. *See Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953)(Democratic Party "club" was a state actor designed to evade constitutional prohibition against all-white primaries); *cf. Morse v. Republican Party of Virginia*, 517 U.S. 186, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996). That is not true here. This is also not an instance in which the government knowingly profits from the racially discriminatory behavior of a privately owned enterprise. *See, e.g., Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Blum*, 457 U.S. at 1010–11, 102 S.Ct. at 2788–89. That type of symbiotic relationship has been found to create state action where the government tacitly endorses and becomes entangled with private racial discrimination. *Burton*, 365 U.S. at 724, 81 S.Ct. at 861. Even if that race discrimination model for state action were imported here, there is no evidence the school officials tacitly endorsed or benefitted from the students' decisions not to run Yeo's ads.

■ The state action cases also consider "de-privatizing" and attributing to the government the actions of private persons where the state has been involved in the sense of delegating traditional governmental authority to a private actor.[10] In *Edmonson*, a private litigant's race-based exercise of peremptory challenges was found to be state action. *Ed-*

*monson*, 500 U.S. at 621, 111 S.Ct. at 2083. The running of trials is a government function and it is the judge who, based on the challenge, excuses the juror. The publishing of a newspaper or a yearbook is most emphatically not a traditional function nor an exclusive prerogative of the government in this country. Private schools commonly have student newspapers, and public schools not uncommonly have independent student newspapers. The delegation of governmental function theory does not establish state action. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (sale of goods in storage by warehouseman did not constitute state action); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (private utility which terminated electric service was not state actor).

### B.

■ Secondly, while there may be rare occasions when a state has a duty to intervene in actions taken by private persons which could give rise to a state action finding, this is not one.[11] *See Ponce*, 760 F.2d at 379–80 (although there may be some occasions in which "[t]he government should be responsible for failing to act where it should act," there was no state action because the government had no affirmative duty to regulate amateur sports leagues). *Cf. DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (finding that the Due Process Clause imposes no affirmative duty on the government to protect citizens from deprivation of life, liberty or property by

There is nothing in the record even to suggest that Kafrissen engaged in such persuasive techniques with regard to the Yeo ad; rather, the uncontradicted evidence is that Kafrissen took prophylactic measures to ensure that the students felt free to make their own decision. At bottom, Yeo's claim of control amount to no more than "conclusory allegations, improbable inferences, and unsupported allegations." *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 536 (1st Cir.1996) (citations and internal quotation marks omitted).

**10.** The school officials point to *NCAA v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469

(1988), where an unincorporated association of public and private colleges was found not to be a state actor even though the association's actions led a public college to take disciplinary action against a basketball coach. But in this case the state actors, the adults, have a supervisory relationship to the private group, the students, and are thus somewhat the inverse of the NCAA and the public college.

**11.** For example, state officials could not personally stand by and watch privately-contracted-for prison guards beat a prisoner to death, and then defend on the ground of no state action.

private actors). Here, the state statute, Mass. Gen. Laws ch. 71, § 82, appears to have been intended, in part, to express Massachusetts' policy judgment that student editors of high school publications generally have editorial autonomy from school officials and that their decisions are not state action. While the state statute cannot be determinative of the outcome of the federal constitutional question, *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 391–93, 115 S.Ct. 961, 971, 130 L.Ed.2d 902 (1995) (statutory declaration that Amtrak is not a government entity not dispositive of governmental action question where constitutional rights are involved), no such duty to act is imposed by state law.

■ The First Amendment free speech and free press guarantees do not involve a duty by the government to act where there is otherwise no state action. Indeed, those guarantees are largely based on prohibitions against government action.[12] "The First Amendment does not reach acts of private parties in every instance where the [government] has merely permitted or failed to prohibit such acts." *CBS v. Democratic Nat'l Comm.*, 412 U.S. 94, 119, 93 S.Ct. 2080, 2095, 36 L.Ed.2d 772 (1973) (plurality opinion). In *CBS*, a plurality of the Supreme Court found that the decisions of broadcasters not to accept any editorial advertising were not government action for purposes of the First Amendment, even though the government both licensed and heavily regulated the broadcasters. *Id.* at 116–19, 93 S.Ct. at 2093–95. As a matter of law, we see no legal duty here on the part of school administrators to control the content of the editorial judgments of student editors of publications. Such a duty—which Yeo in his briefing suggested could be derived from the traditional government function of running schools and the "symbiotic relationship" between the

publications and the school—does not exist and cannot support state action.

### C.

■ We are left with the third theory: that the actions by the students should be attributed to the school officials, despite the officials' lack of actual or effective control and the lack of any duty. The key issue is whether the conduct may be "fairly attributable to the state." *Barrios–Velazquez v. AEELA*, 84 F.3d 487, 491 (1st Cir.1996) (citations and internal quotation marks omitted) (no state action where state did not compel organization of governmental employees of Puerto Rico to act, no traditional government function involved, and no interdependence and joint participation with state is shown).

■ Of course, the fact that the newspaper editors are public school students does not, in itself, make them state actors. Persons do not become state actors because they are clients of government services, whether they are students, hospital patients, or prison inmates. Some, like the students, are government clients by compulsion—here, the truancy and mandatory education laws compel the students' attendance.[13] They may not be converted to the status of government actors simply on such a basis.

■ Yeo argues, using the *Rendell–Baker* terminology, that there is a sufficient nexus to attribute the students' actions to the state. But examining the nexus here between state regulation and financial support of the publications and the challenged decisions militates against a state action finding. *See Blum v. Yaretsky*, 457 U.S. at 1004, 102 S.Ct. at 2785–86; *Rendell–Baker*, 457 U.S. at 838–41, 102 S.Ct. at 2769–71. It is established that a private institution's receipt of state funding does not render that institution's decisions state action. *Rendell–Baker*, 457 U.S. at 840, 102 S.Ct. at 2770–71. This can be so even

---

12. The state action question also cannot be resolved against Yeo on the grounds that the Constitution prohibits the state actors, the school administrators, from acting to interfere with the student editors. *Hazelwood* forecloses such a conclusion.

13. We distinguish those § 1983 cases where the plaintiff is himself a compulsory client of the government, such as is true in suits by persons in custodial care of the state, and sues otherwise private actors who provide services under contract with the state. *See West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Miranda v. Munoz*, 770 F.2d 255 (1st Cir.1985).

when the institution's budget is almost entirely derived from public money. *Id.* Here, the publications are the institutions at issue.

The Yearbook receives no money from the school system other than the indirect assistance it gets from the small stipend received by its faculty advisor. The *Musket* does receive greater financial assistance. Much of its operating costs as well as its advisor's stipend are paid by the school system. However, these facts are far from conclusive. The focus in *Rendell–Baker* was on the interplay between the action at issue and the state funding and regulation, not merely on the amount of state aid or oversight. *Id.* There was no interplay between the decision not to publish the advertisement and the state's provision of financial and faculty support. That the principal kept the checkbook for the school newspaper had nothing to do with the students' decisions whether or not to run the ads.

Yeo's "nexus" argument turns on context. The Yearbook does memorialize in photographs the experiences and personalities in a public high school class. The newspaper is the newspaper of the public high school; its name is the *"Lexington High School Musket"* and it identifies itself with the high school in its communications and interactions with other students and the community. It does receive some financial support from the school and the faculty advisors may have some subtle influence. The newspaper exists in the form it does because the school authorities and state law permit it to do so. While not part of the for-credit educational curriculum, work on the *Musket* does have explicit educational value and provides an attractive credential for students. The student editors perform some of their functions on school

grounds, perhaps even during school hours. All of these factors support Yeo's argument. It is a close question whether the injury caused here "is aggravated in a unique way by the incidents of government authority." *Edmonson,* 500 U.S. at 622, 111 S.Ct. at 2083 (citation omitted).[14]

The Supreme Court has taught that the state action question may shift depending on the context and the question asked. A public defender is not a state actor in her representation of a criminal defendant, even though she may be one in the performance of other duties, such as hiring or firing decisions. *See Polk County,* 454 U.S. at 324–25, 102 S.Ct. at 453–54. Even acknowledging that the public defender is a state employee, *Polk County* considered it important that, in the actual function of defending the client, the public defender's relationship to the state was necessarily independent, and even adversarial, and that the defender exercised independent judgment in the same manner as did attorneys in the private sector. *Id.* at 321–22, 102 S.Ct. at 451–52. So too here.[15]

Here, the students' relationship to the public school officials in the exercise of their editorial judgment was certainly independent. At times, it was close to adversarial. The school officials gained nothing but a lawsuit from the students' decision, and the officials might themselves, as they told the students, have made a different decision. It is not enough to create state action that the decisions took place in a public school setting, that there was some governmental funding of the publication, that teachers were acting as advisors, and that the state actors made an educational judgment to respect the autonomy of the students' editorial judgment.

14. *Cf.* Marjorie Heins, *Viewpoint Discrimination,* 24 Hastings Const. L.Q. 99, 159 (1996)("Public education presents a paradoxical situation: it is government speech for some purposes, yet also a quintessential forum for intellectual growth [and] exploration....").

15. Similarly, in *Edmonson,* not all of the litigation decisions of the defendant private company were deemed to be state action; only the race-based exercise of peremptory challenges were. *See Edmonson,* 500 U.S. at 621–22, 111 S.Ct. at 2083–84. This was, in part, because "[r]acial bias mars the integrity of the judicial system and

prevents the idea of democratic government from becoming a reality." *Id.* at 628, 111 S.Ct. at 2087. Where such interests are at stake, the acquiescence of a government actor in the discriminatory actions of a private party may implicate the Constitution. For example, if this were a claim brought by a student who had been excluded from election to the editorial board on account of her race, and the school officials declined to intervene, the analysis would focus on a different decision and most likely would reach a different result.

Where, as here, there are First Amendment interests on both sides of the case, the analysis of whether there is state action must proceed with care and caution. Because the record establishes that the editorial judgment exercised was the independent judgment of the student editors of both publications, we resolve the question of state action against Yeo.

The decision of the district court is affirmed.[16] Costs are awarded to the Town of Lexington and the defendant school officials.

Concurrences follow.

TORRUELLA, Chief Judge (Concurring).

I concur with the majority opinion but write separately to highlight an important issue that the majority fails to address—the absence of a public forum.

The regulation of speech in forums that have traditionally been available for public expression is subject to the highest degree of scrutiny. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983). These "traditional public forums" include streets, sidewalks and parks. *Id.* In order to further aid citizens' political discourse, the state may, from time to time, create a new public forum for the views of the community. The regulation of speech in these "designated" public forums is also subject to strict scrutiny. *See id.* at 46, 103 S.Ct. at 955–56. However, it is simply not true, as a matter of constitutional law, that each time a state actor solicits advertising, a designated public forum has been created by the government. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (city may solicit advertising for its rapid transit cars while refusing political and public issue advertising).

The Supreme Court has held that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by *intentionally* opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Defense & Educ.*

*Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985) (emphasis added); *see also International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680, 112 S.Ct. 2701, 2706, 120 L.Ed.2d 541 (1992) (when the government opens a forum for certain types of speech, a public forum has not been created unless the government *intended* to create a forum without limitations); *United States v. Kokinda*, 497 U.S. 720, 730, 110 S.Ct. 3115, 3121–22, 111 L.Ed.2d 571 (1990) (plurality opinion) (same); *Perry*, 460 U.S. at 48, 103 S.Ct. at 956–57 (same). Therefore, when school newspapers and yearbooks publish advertising alongside student articles and pictures, it cannot be said that editors are necessarily intending to open a forum for all public discourse.

This Circuit has observed that "in determining whether the government *qua proprietor* has designated public property to be a public forum, courts should be highly deferential to the government's decisions to regulate speech" where those decisions do not evidence viewpoint discrimination. *AIDS Action Committee of Mass. v. MBTA*, 42 F.3d 1, 9 (1st Cir.1994). It follows that the mere absence of a prior written policy against political and public issue advertising should not preclude the Musket from adopting such a policy when the need to do so becomes apparent, so long as the paper has not established a practice of publishing such material. *See Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448–49 (government's intent regarding a forum for speech must be gleaned from policy and practice); *Grace Bible Fellowship, Inc. v. Maine School Admin. Dist. No. 5*, 941 F.2d 45, 47 (1st Cir.1991) (same). In this case, the Musket had not published political or public issue advertising in the past, and Yeo's request did not obligate the paper to begin publishing such material.

When the state solicits advertising for a nontraditional public forum, it is permitted to filter out pure political speech. *See Lehman*, 418 U.S. at 303–04, 94 S.Ct. at 2717–18. Disallowing this filter would shut down potentially robust activities, including many

---

**16.** The motion to strike filed by Yeo in this court is denied as immaterial and moot in light of the court's opinion.

school newspapers, inhibiting the marketplace of ideas protected by the First Amendment. *See Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967) (recognizing that schools are important loci of the "marketplace of ideas" protected by the First Amendment). While it is true that "[t]he line between ideological and nonideological speech is impossible to draw with accuracy," *Lehman,* 418 U.S. at 319, 94 S.Ct. at 2725 (1974) (Brennan, J., dissenting), there is no such line-drawing problem in this case. For this additional reason, the district court must be affirmed.

STAHL, Circuit Judge, concurring in the judgment.

Though I remain persuaded that, on the facts of this case, the student editors were public actors acting under color of state law, further examination of the record during *en banc* review leads me to conclude that this issue is not material to our decision and that the district court properly entered judgment in favor of defendants. I write separately for two reasons. First, because this case is easily resolved on statutory grounds—lack of evidence from which a factfinder could conclude that the defendants "caused" the constitutional violation complained of—I believe the majority's central state action ruling to be an unfortunate breach of the "fundamental rule of judicial restraint ... that [courts] will not reach constitutional questions in advance of the necessity of deciding them." *Three Affiliated Tribes v. Wold Engineering, P.C.,* 467 U.S. 138, 157, 104 S.Ct. 2267, 2278–79, 81 L.Ed.2d 113 (1984). Second, I believe the majority's unnecessary constitutional ruling to be wrong on the merits.

I.

Defendants cannot be liable to plaintiff for damages unless, among other things, they subjected plaintiff to, or caused plaintiff to be subjected to, a deprivation of federal rights. *See* 42 U.S.C. § 1983. Because the Supreme Court has made it clear that § 1983's causation language is to be narrowly construed, *see Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 691–94, 98 S.Ct. 2018,

2036–38, 56 L.Ed.2d 611 (1978) (interpreting the language of § 1983 to preclude the imposition of vicarious liability), the question here quickly reduces to whether one or more defendants can, at the least, be seen as having caused the rejection of the advertisements within the narrow meaning of the statute. *See id.*

As the majority notes, plaintiff has not named as defendants those persons—the student editors of the newspaper and yearbook—who may most readily be seen as having directly subjected him to the alleged deprivation of his First Amendment and equal protection rights. Nor has plaintiff argued that the acts and omissions for which the named defendants may most readily be seen as responsible—delegating decision-making authority to the students and failing to override the students' decisions—caused him to be subjected to constitutional harm. *See, e.g., Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 91–92 & n. 4 (1st Cir. 1994) (discussing this circuit's standard for establishing supervisory liability under § 1983). As a result, no trial is warranted unless there is a genuine issue of material fact as to whether (1) at least one individual defendant actually colluded with the students in the decisions to reject the advertisements; or (2) the rejection was pursuant to a policy or custom of the Town of Lexington. *See, e.g., Board of County Commissioners v. Brown,* —— U.S. ——, ——, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997) (reiterating that, for purposes of § 1983, a municipality causes one to be subjected to a deprivation of federal rights only through its duly-enacted policies or widespread customs having the force of law). In my view, there is insufficient evidence to warrant a trial against any of the named defendants under either of these theories.

Though I continue to disagree with the majority's conclusion that defendants Kafrissen and Mechem did not influence the students' decisions to reject the advertisements, I now concur that the summary judgment record permits only one inference: the students made the ultimate decisions. In the end, I am constrained to agree that, in the face of largely uncontradicted testimony to

contrary effect, Kafrissen and Mechem's use of the term "we" in message-relaying correspondence with plaintiff, and Kafrissen's prior threat to resign, *see ante* at 251 n. 9, do not allow a determination that defendants Kafrissen or Mechem can be held liable for the decisions made. And with respect to the other individually-named defendants, so also do I agree that there is no basis for concluding that they participated in the rejections of the advertisements. Thus, there is insufficient evidence of statutory causation for plaintiff to proceed to trial against any of the individual defendants.

With respect to the Town, I agree with the majority's conclusion that there is no basis for attributing to it the conduct of the students. *See ante* Part III, Sections A and C. I take issue, though, with the method by which the majority reaches its conclusion. Specifically, I disagree with its direct (though reverse) application to this case of those Supreme Court state action cases which look for state action in *private* conduct. *See generally id.* (applying, in order, *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Morse v. Republican Party of Virginia,* 517 U.S. 186, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996); *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); and *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), to determine that the defendants to this lawsuit, all of whom are public actors, are not liable for the students' conduct). While these cases might, by analogy, shed light on what will *not* be considered constitutionally tortious municipal conduct under § 1983, *see, e.g., Rendell–Baker,* 457 U.S. at 840–41, 102 S.Ct. at 2770–71 (strongly supporting an argument that neither municipal funding nor municipal regulation of a private entity constitutes municipal "policy" for purposes of § 1983), not one of them speaks to the question directly posed here: can conduct by non-legislative and non-policy making actors be deemed to have been suffi-ciently caused by municipal policy or custom for liability to attach *to the Town?* Nor does any one of these cases involve harm-causing conduct which can be seen as having been committed by *public* actors. For these reasons, I fear that the majority opinion confuses more than it clarifies.

Moreover, the majority has entered an area it could and should avoid. The Town's freedom from liability flows less from the fact (if it be fact, *see infra* Part II) that the students are private actors than from the fact that the students' actions were not caused by Town policy or custom. Again, plaintiff has not advanced as a theory of liability the Town's decision to let the students decide—the only municipal policy or custom which can arguably be seen at play here. And even if plaintiff had so argued, it seems obvious that, as an action taken in what appears to have been good faith reliance upon state law, *see* Mass. Gen. L. c. 71, § 82, this policy cannot give rise to municipal liability under § 1983. *See Surplus Store & Exchange, Inc. v. City of Delphi,* 928 F.2d 788, 791–92 (7th Cir.1991).

In the end, defendants are entitled to judgment because they did not, under § 1983, ultimately cause the conduct of the non-party students. We should not go beyond this simple fact to decide the case.

## II.

By resolving this dispute through application of those cases which look for state action in private conduct, the majority proceeds from the premise that the students were private actors. I not only find this implicit holding to be unnecessary, I believe it to be incorrect on the merits. In my view, had plaintiff sued the student editors directly, we would have been obliged to rule that they were, in fact, public actors insofar as they solicited and published advertisements from paying third parties.

Whether a person or entity is a private or a public actor obviously cannot be resolved through application of cases which presume that the actor is private; it is resolved by a fact-specific inquiry into whether the person or entity is, in context, acting "under color of

state law." *See Polk County v. Dodson,* 454 U.S. 312, 322 n. 12, 102 S.Ct. 445, 452 n. 12, 70 L.Ed.2d 509 (1981) (noting the distinction). Although the Supreme Court has sometimes stated that the state action and under color of state law questions are coextensive, *see, e.g., United States v. Price,* 383 U.S. 787, 794 and n. 7, 86 S.Ct. 1152, 1156–57 and n. 7, 16 L.Ed.2d 267 (1966), it also has recognized that they are not invariably the same. That the inquiries sometimes diverge is clear in *Dodson* where, without reference to a single state action case, the Court concluded that a state public defender does not act under color of state law while acting as counsel to an indigent defendant in a state criminal proceeding. 454 U.S. at 320–24, 102 S.Ct. at 450–53.

Here, as in *Dodson,* the question (had plaintiff raised it) would not have been whether private conduct should be attributed to the Town; rather, it would have been whether the conduct was, as an initial matter, public or private. *Cf. Blum v. Yaretsky,* 457 U.S. 991, 1003–04, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982) (contrasting "those cases in which the defendant is a private party and the question is whether his conduct has sufficiently received the imprimatur of the State so at to make it 'state' action for purposes of the Fourteenth Amendment" with "cases in which the challenged conduct consists of enforcement of state laws or regulations by state officials who are themselves parties in the lawsuit"). And the state action tests the majority relies upon, designed as they are to determine whether private conduct is attributable to the state, would not have helped answer the question.

To illustrate, when an on-duty municipal police officer misuses the power of the office to carry out a personal vendetta, we do not decide whether he was acting under color of state law by reference to whether the municipality is itself liable for the conduct. *See, e.g., Martinez v. Colon,* 54 F.3d 980 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995). We decide it on a more contextually-appropriate inquiry into whether the officer has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id.* at 986 (quoting *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988)). So here should we decide whether the students are public or private actors by reference to criteria other than those we would use to decide whether the Town must pay for the students' acts.

What criteria should be used? A helpful starting point is *Dodson,* where the Court's ruling was informed by two primary considerations: (1) "a public defender is not amenable to administrative direction in the same sense as other employees of the State," 454 U.S. at 321, 102 S.Ct. at 451; and (2) "it is the constitutional obligation of the State to respect the professional independence of the public defenders whom it engages," *id.* at 321–22, 102 S.Ct. at 451. Here, both factors militate in favor of finding that, insofar as they solicited and published (or declined to publish) advertisements from paying third parties, the students acted under color of state law. Certainly, the power of school officials to regulate the content of student publications and the acts of their student editors, *see Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266–70, 108 S.Ct. 562, 567–70, 98 L.Ed.2d 592 (1988), is near its apex where the subject of the regulation involves the students' commercial interactions with third parties. And where these interactions arguably implicate the constitutional rights of those third parties, *cf. Dodson,* 454 U.S. at 321–22, 102 S.Ct. at 451–52, and hold out the prospect of monetary benefit to the Town, *see, e.g., Burton,* 365 U.S. at 724, 81 S.Ct. at 861 (indicating that conduct which leads to monetary benefits for the State will often be deemed action on behalf of the State), the question is less whether the students may be regulated and more whether the students must be regulated.

My position is narrow. I have never doubted that the student writers are private actors with respect to reporting and editorializing. A contrary holding would, after all, effectively spell the end of public school student publications; one would be hard-pressed to report and could never editorialize without violating the First Amendment's mandate of viewpoint neutrality. *See gener-*

*ally* R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). I only suggest that, to the extent public school students solicit funds to support a public enterprise in their capacities as officials of that enterprise, they act under color of state law. *See Dodson,* 454 U.S. at 324–25, 102 S.Ct. at 453–54 (making clear that an actor can act under color of state law in one capacity but not in another); *see also ante* at 254.

At the very least, that the students are private actors is not such an open and shut matter that it should be assumed *sub silentio.* If the student editors of the *Musket* determined to run the paid political advertisements of Democratic candidates for Town office but not those of Republican candidates, and if the Republican candidates sought injunctive relief against the students in their capacities as editors of the *Musket,* would we summarily conclude that the challenged action was not undertaken under color of state law? I would like to think not. Though the facts of the present case are less egregious, the underlying question—not presented here because of plaintiff's pleading decisions—is the same.

### III.

For the reasons stated, I concur in the majority's conclusion that judgment was properly entered in favor of defendants. I do not, however, concur in the reasoning that leads it to this conclusion. I would instead resolve the case under well settled law that precludes a finding, under § 1983, against any of the defendants named in the complaint for the theories of recovery plaintiff has advanced.