Douglass v. Londonderry School, et al CV-04-424-SM  02/14/05  P

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Blake S. Douglass, a minor,
By and through his next friend
and father, J. Sherwood Douglass,
     Plaintiff

     v.                                    Civil No. 04-424-SM
                                           Opinion No. 2005 DNH 019
Londonderry School Board, et al.,
     Defendants


**O R D E R**

Blake Douglass, a senior at Londonderry's public high school, challenges editorial decisions that have effectively limited his ability to express his individuality in his yearbook photograph.  The basic legal question presented is whether the United States Constitution limits editorial authority over school-related publications and, if so, to what extent.  Before the court is Blake's motion for preliminary injunctive relief. Defendants object.


Blake argues that he is entitled to control the form, content, and presentation of his photographic portrait in the senior section of the 2005 Londonderry High School Yearbook.  Or, viewed from a slightly different perspective, he claims that

school officials may not lawfully refuse to publish the senior portrait he submitted merely because they disapprove of the "message" they think readers will take from it. Blake insists upon publication of a yearbook photograph that shows him dressed in trapshooting gear and holding a shotgun broken open over his shoulder, in a safe fashion. He points out that, in the past, other students were permitted to pose with items expressing their hobbies or interests, such as athletic equipment, cars, and musical instruments. Accordingly, he claims that the refusal to publish his chosen photograph in the senior portrait section of the yearbook amounts to unconstitutional viewpoint discrimination, in violation of his First Amendment rights.

Blake's lawsuit seeks preliminary and permanent injunctive relief that would compel school authorities to publish his chosen photograph in the senior portrait section of the yearbook. But, as will be discussed, based upon the pleadings, exhibits, and testimony presented at a hearing, he has not established (and perhaps cannot establish) the necessary prerequisites for equitable relief. That is, he has not demonstrated a likelihood

2

of success on the merits of his constitutional claims and, in fact, it appears unlikely that he will succeed on those claims.

## Standard of Review

To obtain a preliminary injunction, Blake must establish each of the following: (1) a likelihood of success on the merits of his claims (either at summary judgment or at trial); (2) the potential for irreparable harm if an injunction is not issued; (3) that the hardship imposed upon defendants if they are enjoined will be less than the hardship he will suffer if no injunction issues; and, finally, (4) that issuance of an injunction is consistent with (or at least not contrary to) the public interest. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996).

## Findings of Fact

At the hearing on his motion for preliminary injunctive relief, Blake called two witnesses: his father, J. Sherwood Douglass, and the principal of Londonderry High School, James Elefante. Defendants did not call any witnesses, but did cross-examine those called by plaintiff. Based upon the testimony and

3

documentary evidence presented at that hearing, the court makes the following findings of fact.

Blake Douglass is a senior at Londonderry High School and an avid trapshooter. The high school does not sponsor or support an organized trapshooting team or club. Accordingly, Blake pursues his hobby independently. In late summer of 2004, Blake went to a studio used by many local students for yearbook pictures, to have his senior portrait taken. He decided to pose for his senior portrait in dress that communicated his keen interest in sport shooting; he wore trapshooting attire, including a pocketed shooting vest with what appear to be two shotgun shells in his vest pocket, and he crouched on one knee, with his Ruger shotgun safely broken open over his shoulder. At some point during the session, the photographer suggested that Blake might want to pose for some additional pictures, without the shotgun, noting that a photo including a firearm might not be deemed appropriate by yearbook officials. Blake did so.

Alerted by the photographer's comment about the potentially controversial nature of his senior portrait, Blake's mother

contacted the yearbook faculty advisor, Mr. Juster. She described the photograph to Mr. Juster, who told her, based on her description, that he did not believe the yearbook would agree to publish the photograph. Blake's mother then asked if she could meet with Mr. Juster, to show him the photograph before any decision was made regarding its propriety. Mr. Juster agreed. But, after seeing the photograph, Juster affirmed his initial impression and told Mrs. Douglass that he thought the photo was inappropriate for the senior portrait section of the yearbook. Mr. Juster also told Mrs. Douglass that Blake could discuss the matter further with the school's principal, Mr. Elefante, if he wished.

Blake did take the issue up with Mr. Elefante. Mr. Elefante also reviewed the photograph and explained that, while he had only recently assumed the role of principal, and was not an active participant in editing or laying out the yearbook, his own initial impression was that the photograph was inappropriate for publication in the senior portrait section. But, he told Blake that before any final decision would be made regarding publication, he would have to consult with the yearbook's

5

editorial staff.  Blake's parents then retained legal counsel. Subsequently, Mr. Elefante met with Blake's parents and their legal counsel, and reiterated the same views he had shared with Blake.  Elefante did concede that if the same photo were submitted, but without the shotgun resting on Blake's shoulder, he would have little concern about publishing it in the senior section of the yearbook.

In an effort to persuade school officials that the photograph of Blake with the shotgun should be published in the senior portrait section, Blake and his parents reviewed Londonderry High School yearbooks from the past twenty years or so, collecting photographs in which students were engaged in seemingly violent, unlawful, and/or vulgar behavior (e.g., posing with weapons or simulated weapons, making offensive gestures, referencing use of alcohol by minors, etc).  No doubt, their point was that Blake should not be treated differently based on the content of his photograph, which was fairly benign when compared to some that had been published in the past.

School officials remained unpersuaded, noting that the yearbook reflects current standards and values of the community, and that those standards had evolved since the 1980s and even the 1990s. School officials also told the Douglass family that they did not want students to use their senior portraits to advocate politically charged positions or evoke divisive issues in the community. The Douglass family countered that Blake wanted that particular picture in the senior section of the yearbook not for the purpose of provoking controversy, but simply because he wished to express his enthusiasm for trapshooting, his major recreational interest. The photograph, they said, did not represent any type of political statement or implicit comment on gun regulation, or the right to bear arms, or the reach of Second Amendment.[1]

Meanwhile, the students who comprised the yearbook staff became aware of the controversy. At some point, the ten student

---

[1] That claim is contradicted somewhat by the senior quotation Blake submitted to yearbook staff, for publication just under his senior picture: "'From my cold dead hands!' - Charlton Heston (May 20, 2000)." Taken together, the photograph of Blake posing with his shotgun and the Heston quote immediately beneath it might reasonably be viewed as a comment on gun control, a matter of some public controversy. Nevertheless, the yearbook staff agreed to publish the quotation.

editors of the yearbook met to discuss the issue. They took an informal vote on whether to publish the photograph Blake submitted and initially, before they saw the photograph, six editors expressed the view that the photograph was inappropriate for the senior portrait section, while four expressed the view that it was appropriate. Later, the editors examined the photograph and met with Principal Elefante to discuss the issue further. Mr. Elefante testified that he told the student editors that he wanted the yearbook to represent their thoughts and views and, therefore, solicited their opinions on the issue. After the students discussed the issue among themselves (with Mr. Elefante present) for approximately 30 minutes, Elefante asked if they would take a "straw poll," so he might see how many editors were in favor of publishing the photograph and how many were opposed. Eight of the student editors tentatively voted against publishing the photograph in the senior portrait section and two voted in favor.

Eventually, according to Mr. Elefante's testimony, the yearbook editorial staff formally voted on the issue, and all ten editors agreed that the photograph of Blake posing with his

8

shotgun should not appear in the senior portrait section. But, in an effort to accommodate Blake's desire to have that particular photograph published, the student editors proposed to publish it in the community sports section, a section of the yearbook dedicated to students' pursuits of extracurricular activities not officially sponsored by the school, such as skiing, archery, biking, bowling, etc. Blake and his parents rejected that proposal. Blake did, however, submit an alternate photograph for the senior portrait section, in case his efforts to compel the publication of his chosen photograph proved unsuccessful.

When questioned by the court, Mr. Elefante testified that if the students had voted to publish the photograph in the senior portrait section, he would have given that decision substantial weight. But, he and the faculty members who served as advisors to the yearbook (and, presumably, the school board), retained full authority to overrule such a student vote. Because the students unanimously voted not to publish Blake's chosen photograph in the senior portrait section, however, neither the

school's faculty advisors nor its administrators were called upon to exercise that veto authority.

When Blake and his parents learned of the decision not to publish Blake's chosen photograph in the senior portrait section and, instead, to publish it in the community sports section, they filed this lawsuit. While the suit was pending, and in advance of the hearing on plaintiff's motion for preliminary injunctive relief, the Londonderry School Board enacted a new policy regarding school yearbook publications. That new policy provides:

> Senior Portraits:   All senior portraits shall be of the student only with a traditional indoor or outdoor background. No props, instruments, pets, athletic equipment, hobby items, or vehicles shall be allowed in the photographs. Clothing shall be modest and free of slogans and/or political expressions and such clothing shall be in conformance with the School district's dress code. Photographs of seniors engaged in non-School District sponsored sporting events (only Olympic or NHIAA sanctioned events qualify) may be submitted for inclusion on the community sports page.

> Advertisements:   The Londonderry High School yearbook and other school yearbooks are not a public forum. Accordingly, any advertisements must be free of political expression and reflect the common values of the Londonderry School District. Advertisements shall not promote the use of tobacco, drugs or the use of other items prohibited from use on school grounds.

10

> Senior Messages:   All senior messages shall be free of
> personal attacks, abusive language, racial epithets, vulgar
> comments, sexual innuendo, and all other speech that is
> inconsistent with the shared community values of the
> Londonderry School District.

Londonderry School District Yearbook Policy, adopted January 11,
2005 (emphasis supplied).

Although he is not a member of the school board, Mr.
Elefante testified, both on direct and cross-examination, that
the new policy was not aimed at suppressing Blake's particular
viewpoint regarding firearms, nor was it specially designed to
prevent his chosen photograph from appearing in the senior
portrait section of the yearbook.  Instead, Mr. Elefante said,
the policy was implemented to free student editors and school
officials from having to annually determine which props, slogans,
or political speech used in students' senior photographs might be
offensive or might risk associating the school with non-neutral
positions on divisive social or political issues - an editorial
task which requires them to constantly draw difficult lines on a
case-by-case basis.  That is, the new policy was designed to
standardize the senior portrait section and minimize the need for
discrete content-based editorial decision-making.

11

## Discussion

I.   State Action.

Plaintiff advances his federal constitutional claims pursuant to 42 U.S.C. § 1983.  Under that statute, a federal cause of action may be asserted against any person who, while acting under color of state law, "subjects or causes to be subjected . . . [another] to the deprivation of any rights, privileges, or immunities secured by the Constitution."  In order to prevail on the merits in this case, Blake must first establish that the named defendants deprived him of a constitutional right and acted under color of state law when they did so.  See, e.g., Polk County v. Dodson, 454 U.S. 312, 315 (1981) (noting that, as a jurisdictional prerequisite to pursuing a claim under section 1983, a plaintiff must establish that a defendant acted under color of state law).

Ordinarily, a federal constitutional violation does not arise when a private citizen acts.  For example, barring unusual circumstances, a private employer does not violate the First Amendment rights of its employees by implementing a policy preventing employees from displaying political placards, slogans,

12

or bumper stickers in their offices.  See generally Denver Area Educ. Telecoms. Consortium v. FCC, 518 U.S. 727, 737 (1996) ("We recognize that the First Amendment, the terms of which apply to governmental action, ordinarily does not itself throw into constitutional doubt the decisions of private citizens to permit, or to restrict, speech."); Hudgens v. NLRB, 424 U.S. 507, 513 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state.  Thus, while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself.") (citation omitted).  In other words, the First Amendment protects individuals against governmental action; it does not restrict the conduct of private citizens, nor is it violated when one private actor "suppresses" the speech of another.

The first hurdle Blake faces, then, is that he must show that people acting under color of state law - state actors - made the decision that allegedly deprived him of his First Amendment

13

rights.  In that regard, he (or his counsel) appears to have sued the wrong people.  That is to say, Blake has sued people who, although they are state actors, do not appear to be the ones who made the decision not to publish his chosen photograph in the senior section of the yearbook, at least not the controlling decision.

As noted, the record evidence establishes that the challenged conduct in this case - the decision not to publish the photograph of Blake holding a shotgun in the senior portrait section of the yearbook - was actually made (unanimously) by the ten student editors of the yearbook, and not school officials.  None of those students is a named defendant in this case.  And, even if Blake had sued those students, it seems clear on the record as it stands that none is a state actor (that is to say, none of the students may properly be viewed as "the government" for purposes of this suit).  The fact that the school's principal, the yearbook's faculty advisors, and/or the school board (all of whom are unquestionably "state actors") retained authority to overrule the students' editorial decisions does not, standing alone, convert the students into state actors.  Nor does

14

the fact that the school's administration may have endorsed the editors' decision (indeed, fully agreed with and supported it), turn the student editors into state actors for purposes of this suit.

The critical facts here are that the students were vested with editorial discretion and they apparently made the controlling decision not to publish the photograph Blake originally submitted. Absent state action, the students' decision not to publish Blake's chosen photograph (or, perhaps more accurately, the decision to publish it in the community sports section, rather than in the senior portrait section) cannot be said to have violated Blake's First Amendment rights. As the court of appeals for this circuit noted only a few years ago:

> The essential state action inquiry is whether the government has been sufficiently involved in the challenged actions that it can be deemed responsible for the plaintiff's claimed injury. If there is no state action, then the court may not impose constitutional obligations on (and thus restrict the freedom of) private actors.

15

<u>Yeo v. Town of Lexington</u>, 131 F.3d 241, 248-49 (1st Cir. 1997) (footnote omitted).

In <u>Yeo</u>, the Court of Appeals for the First Circuit concluded, under circumstances similar to those presented here, that student editors of a public high school yearbook and newspaper are not "state actors" for First Amendment purposes.

> Where, as here, there are First Amendment interests on both sides of the case, the analysis of whether there is state action must proceed with care and caution. Because the record establishes that the editorial judgment exercised was the independent judgment of the student editors of both [the school newspaper and the school yearbook], we resolve the question of state action against [finding that the students were state actors].

<u>Id.</u> at 255.

In reaching the conclusion that student editors of the school newspaper and yearbook in <u>Yeo</u> were not, for purposes of constitutional analysis, state actors, the appellate court considered and rejected three separate theories advanced by the plaintiff in that case (theories that have not, but could have been advanced by Blake's counsel in this case): First, that the

16

editorial decisions were actually controlled by school officials, thereby injecting the necessary element of state action; second, that even if the state did not actively direct or control editorial decisions made by the students, the state had a duty to intervene and control the content of school publications, thus making the students state actors; and, finally, that even if editorial decisions were made independently by the students, those decisions are fairly attributed to school officials (plainly state actors), because they were made in the school setting. Id. at 252-55. The court rejected each of those arguments in turn, concluding that editorial decisions made by public school students do not constitute "state action."

Nothing in the factual record of this case (at least as it presently stands) suggests any basis upon which to distinguish it from the Yeo case. The decision not to publish the photograph originally submitted by Blake in the senior portrait section was, according to the uncontradicted testimony of Principal Elefante, made by the student editors of the yearbook; those student editors appear to have been vested with substantial discretion to decide matters relating to the content and lay-out of the

17

yearbook; although the decision was endorsed and perhaps even applauded by school officials, the students' decision was apparently neither mandated by nor controlled by any of the named defendants in this case; and, finally, the fact that public school officials might be vested with authority to reject student editors' publication or lay-out decisions is not, standing alone, sufficient to imbue the students' decisions with state action, nor does it transform student editors into state actors.

The decision to "suppress" Blake's speech based upon its content - if the decision to publish his photograph in the community sports section of the yearbook, rather than in the senior portrait section, is correctly viewed as "suppressing" Blake's speech - was made by private citizens, not state actors. In simple terms, the state has not, it seems, suppressed Blake's speech; his fellow students have done so, for reasons they deemed appropriate in developing, editing, organizing, and publishing the yearbook. The First Amendment to the Constitution simply does not preclude such conduct by private actors. Consequently, Blake has not met his burden of demonstrating that he is <u>likely</u>

18

to succeed on the merits of his First Amendment claim, a prerequisite to obtaining preliminary injunctive relief.

II.  <u>The Londonderry School District Yearbook Policy</u>.

Even if Blake could establish state action in the decision not to publish his desired photograph in the senior portrait section, his request for preliminary injunctive relief would still fall short.  Parenthetically, the court notes that the final decision not to publish Blake's chosen photograph in the senior portrait section was made before the new yearbook policy was adopted, and that decision has not been changed (nor does it appear that it was affirmed under the new policy).  The new policy did affect two other students, who submitted senior portraits which included props of some sort.  Absent the new policy, their photographs likely would have been published in the senior portrait section, but now run afoul of the new "no props" policy.  Of course, Blake's proposed picture also runs afoul of the new "no props" policy.  As it turns out, however, even if the new policy had been or is now invoked as an additional or superceding reason to reject Blake's chosen photograph, his challenges to that policy would still fail.

19

The recently enacted yearbook policy - which, by its terms, applies to this year's edition of the Londonderry High School Yearbook - is, on its face, viewpoint-neutral regarding limitations imposed on the subject-matter of senior portraits. Plaintiff appears to concede as much.[2]

Accordingly, even though the new policy effectively precludes Blake's proposed photograph, and suppresses whatever message it might arguably convey (regardless of whether one views that message as "I enjoy trapshooting" or "I am against gun control"), the policy does not do so in an impermissible or unconstitutional manner. The new yearbook policy does not single out any particular viewpoint(s) for preferential treatment, nor does it single out any for unfavorable treatment. Instead, Londonderry's new yearbook policy uniformly precludes all students from posing with any props, whether they are automobiles, pets, sporting equipment, beverages, or firearms.

---

[2] At the hearing, counsel for plaintiff agreed that, "if this policy had been in place at the beginning of the school year, [Blake] couldn't have posed with a shotgun. There is absolutely no question about it."

20

Blake has not demonstrated that such a content (and viewpoint) neutral policy is likely to be held unconstitutional.[3]

Nor has he demonstrated that the new yearbook policy is being enforced selectively, in an effort to single out his particular speech for special treatment. In fact, Mr. Elefante's uncontradicted testimony established that the new policy was applied even-handedly, and that two other seniors who, like Blake, had submitted photographs of themselves posing with props, were notified that they would have to submit different photographs. Both did so.

---

[3] Although the distinction between content-based restrictions and those which are viewpoint-based is somewhat imprecise, see, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 831 (1995), this much can be said with relative confidence: content-based restrictions tend to focus on the subject matter of speech, whereas viewpoint-based restrictions tend to focus on the speaker's perspective or opinion on a particular subject. Viewpoint-based restrictions on speech are, then, a subset of content-based restrictions. See Id. at 829 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.") (citation omitted).

Through his counsel, Blake suggests (but does not develop any supporting legal argument) that because the policy was adopted shortly after he filed suit, it necessarily constitutes an impermissible effort to stifle his constitutionally protected speech.  Although the precise contours of Blake's claim are unclear, he seems to contend that an otherwise viewpoint and content-neutral policy may, nevertheless, be unconstitutional if its enactment was motivated by an intent to suppress his speech.  If the court has accurately interpreted plaintiff's claim, he has failed to point to any authority which might support it.

The general rule, as expressed by the Supreme Court, is that an illicit motive underlying the enactment of an otherwise valid and content-neutral regulation will not invalidate that regulation.

> It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.  As the Court long ago stated: "The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted."

<u>United States v. O'Brien</u>, 391 U.S. 367, 383 (1968) (quoting <u>McCray v. United States</u>, 195 U.S. 27, 56 (1904)).  The Court of Appeals for the Seventh Circuit summarized this principle rather well when it noted that "[j]ust as we would never uphold a law with unconstitutional effect because its enactors were benignly motivated, an illicit intent behind an otherwise valid government action indicates nothing more than a failed attempt to violate the Constitution."  <u>Grossbaum v. Indianapolis-Marion County Bldg. Auth.</u>, 100 F.3d 1287, 1293 (7th Cir. 1996).

This court is aware of the Supreme Court's decision in <u>Cornelius v. NAACP Legal Defense & Educ. Fund</u>, 473 U.S. 788 (1985), which might seem to be at odds with (or, perhaps, describe an exception to) the general rule.  There, the Court held that, "[t]he existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination."  <u>Id.</u> 811.  <u>See also</u> <u>Ridley v. Mass. Bay Tansp. Auth.</u>, 390 F.3d 65, 77 (1st Cir. 2004) ("If [defendant] revised [its guidelines on the types of advertising it accepts] merely as a ruse for

impermissible viewpoint discrimination, that would be found unconstitutional regardless of the type of forum created.").

Importantly, however, in Cornelius the Court was concerned with the government's subjective motivations because the case involved a restriction on speech which was not content-neutral - under the challenged policy, some organizations were allowed to participate in the federal government's general charity drive, known as the Combined Federal Campaign, while others were not. That fact distinguishes Cornelius (and Ridley) from this case, in which the new Londonderry School District Yearbook Policy is plainly both content and viewpoint neutral, precluding, as it does, all, not "some," props from senior portraits. The Court of Appeals for the Seventh Circuit explained the significance of this distinction in clear and succinct language:

> Because the government was distinguishing among groups based on the content of their messages (either advocacy or nonadvocacy), the [Cornelius] Court remanded the case to see whether the government was really targeting certain viewpoints.

> Where, however, the government enacts a content-neutral speech regulation for a nonpublic forum, there is no concern that the regulation is "in reality a facade for viewpoint-based discrimination." Whatever the intent of the government actors, all viewpoints will be

24

> treated equally because the regulation makes no distinctions based on the communicative nature or impact of the speech. A facade for viewpoint discrimination, in short, requires discrimination behind the facade (i.e., some viewpoints must be disadvantaged relative to other viewpoints). . . . When the government restricts speech in a content-neutral fashion, however, all viewpoints - from the Boy Scouts to the Hare Krishnas - receive the exact same treatment.

Grossbaum, 100 F.3d at 1298 (quoting Cornelius, 473 U.S. at 811) (emphasis supplied). So it is in this case. Because the new yearbook policy treats all seniors similarly and prohibits all from posing with any sort of props, regardless of the message sought to be conveyed, the new policy governing what is at best a nonpublic forum, is content-neutral. The school board members' subjective motivations in enacting that policy, then, are not legally relevant. But, even if they had acted only to suppress Blake's chosen photograph - and no direct evidence has been presented suggesting that they did - at best they engaged in "nothing more than a failed attempt to violate the Constitution." Id., at 1293.

Finally, it probably bears noting that even if Blake could point to some legal authority supportive of his view that a

25

discriminatory motive underlying the school board's adoption of a content-neutral policy might invalidate that policy, he has failed to present any evidence, other than an inference arising from the timing of the board's decision to adopt the new policy, which supports his assertion that the board was motivated by an intent to suppress his constitutional rights. To the contrary, the only direct evidence on that point is the testimony of Mr. Elefante, who repeatedly stated that the new policy was adopted so school administrators and faculty would not have to be involved in an annual task of weighing the relative appropriateness or inappropriateness of various props, costumes, or slogans that students might wish to include in their senior portraits.[4]

It is, of course, likely that the local controversy surrounding publication of Blake's photograph prompted the school

_____

[4] The United States Supreme Court has made clear that, with regard to student publications, public schools do "retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the shared values of a civilized social order, <u>or to associate the school with any position other than neutrality on matters of political controversy.</u>" <u>Hazelwood Sch. Dist. v. Kuhlmeir</u>, 484 U.S. 260, 272 (1988) (citation and internal punctuation omitted) (emphasis supplied).

board to adopt the new policy to avoid future conflicts of that sort. Nevertheless, Blake has failed to demonstrate that the new policy constitutes either a ruse or facade, actually designed to suppress his particular message. Of course, after some fact discovery and legal research, it is possible that Blake might better support his position (either at summary judgment or trial). At this stage, however, Blake has failed to demonstrate that he is likely to prevail on the merits of his federal claim relative to the new policy as well, so, again, has not met his burden with regard to the "likelihood of success" prerequisite to obtaining injunctive relief.

## Conclusion

The evidence of record establishes that the student editors of the Londonderry High School Yearbook decided (unanimously) not to publish the photograph of Blake posing with his shotgun in the senior portrait section of the yearbook. Given the controlling legal precedent in this circuit, and based upon the evidentiary record as it presently stands, the court cannot conclude that the students' decision involved "state action," or was taken under color of state law. Accordingly, plaintiff has failed to

27

demonstrate that he has a viable constitutional claim. Necessarily, then, he has not shown that he is likely to prevail on the merits of any federal constitutional claims.

Moreover, even if plaintiff had established that "state action" was involved in the decision not to publish the photograph he originally submitted in the senior portrait section, he has failed to show that the new Londonderry School District Yearbook Policy unconstitutionally abridges his First Amendment rights, or that the policy would be unenforceable as to him. (Plaintiff's counsel implausibly suggested at the hearing that some form of estoppel might preclude enforcement of the policy because it was adopted well into the school year, or that the policy is unenforceable as some form of impermissible ex post facto regulation, interfering with Blake's vested right to have the photograph of his choosing published in the senior section of the yearbook. Neither argument has merit.)

For the foregoing reasons, plaintiff's Motion for Expedited Consideration of Motion for Preliminary Injunctive Relief (document no. 11) is granted. His Motion for Preliminary

28

Injunctive Relief (document no. 12) is, however, denied. Unless a genuine dispute of material fact exists regarding the student editors' decision, or their status as private actors, the case would seem to be ripe for summary judgment disposition (e.g., an editorial decision by private actors does not give rise to a constitutional violation, nor does a content-neutral publication policy). A prompt further pretrial status conference, on the record, will be scheduled by the Clerk of Court.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

February 14, 2005

cc:  Penny S. Dean, Esq.
     Russell F. Hilliard, Esq.

29