Douglass v. Londonderry School          CV-04-424-SM  03/17/05  P
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Blake S. Douglass, a minor,
By and through his next friend
and father, J. Sherwood Douglass,
      Plaintiff

      v.                                Civil No. 04-424-SM
                                        Opinion No. 2005 DNH 044
Londonderry School Board, et al.,
      Defendants


_____      **O R D E R**


      On February 14, 2005, the court denied plaintiff's motion

for preliminary injunctive relief.  In that motion, the

plaintiff, Blake Douglass, sought an order compelling defendants

to publish a photograph of him posing in trap shooting attire and

holding a shotgun in the senior portrait section of the

Londonderry High School Yearbook.  Douglass v. Londonderry Sch.

Bd., 2005 DNH 19 (D.N.H. Feb. 14, 2005) ("Douglass I").

Plaintiff did not move the court to reconsider the order denying

injunctive relief, nor did he appeal that order.


      Subsequently, plaintiff, through counsel, waived his right

to a jury trial on all issues so triable, electing instead to

proceed with a bench trial on all claims in his amended complaint, including his request for permanent injunctive relief. Given plaintiff's jury trial waiver, the court determined that it could proceed to trial. See Perez-Serrano v. DeLeon-Velez, 868 F.2d 30 (1st Cir. 1989)(where both damages and injunctive relief are sought under § 1983, it is error for the court, rather than the jury, to determine facts common to both the equitable and legal claims). On March 8 and 9, 2005, the parties tried the case to the court.

**Background**

The factual background is set forth in detail in Douglas I. Accordingly, only brief reiteration of the pertinent facts, in the context of the evidence presented at trial and a discussion of the pending legal issues, is necessary here.

As explained in the court's previous order, to prevail on his federal claims Blake Douglass must prove that one or more of the named defendants deprived him of a constitutional right while acting under color of state law. 42 U.S.C. § 1983; See Polk County v. Dodson, 454 U.S. 312, 315 (1981). The defendants, all

2

public school officials, do act under color of state law when exercising their official functions.  So, the state action element of Blake's § 1983 claim is easily satisfied if any one of the defendants made the decision to exclude his photograph from the yearbook.  They deny making the decision, however, and, instead, say that the core leadership group of the yearbook club - the student editors - made the decision.  If the students, normally private citizens, actually made the decision, but did not "act under color of state law," then, of course, the § 1983 claim necessarily fails.  If they did act under color of state law, a question arises with respect to the application of a new publication policy imposed by the school board (plainly state actors) that, independently, would preclude publication of Douglass' photograph as it currently stands.

**State Action**

The Londonderry High School yearbook is a club project. That is to say, it is the product of volunteer efforts by students, who solicit advertisements, develop content, write text, create graphics, take and gather photographs, edit submissions, work on lay out, proofread, and perform the host of

3

miscellaneous tasks essential to any successful publication.  The
club is assisted by two faculty advisors, one of whom (Mr.
Graichen) focuses on computer-related lay-out and production
tasks, and the other (Mr. Juster) on general matters.  Both
receive a stipend for their extracurricular work, and each no
doubt contributes substantially to the success of the project.

At the beginning of each school year Mr. Graichen, the
senior faculty advisor, reviews student applications to serve on
the yearbook staff, and identifies students he will appoint as
"editors."  Those students are invited, or are expected to attend
a yearbook conference sponsored by a national yearbook publisher.
That conference is held very early in the school year.  It is
generally understood that the conference attendees will form the
core or leadership group of the yearbook staff, and will be
assigned specific editorial roles (e.g., Photo Editor, Sports
Editor, Seniors Editor, Editor-in-Chief, etc.).

At the beginning of the 2004-05 school year, as usual, the
leadership group assembled in the school lobby to board
transportation to the yearbook conference.  Before leaving,

4

however, Mr. Juster, one of the yearbook faculty advisors, approached the group and showed them the photograph Blake Douglass proposed to have published as his senior portrait. He asked them to discuss and consider the matter, stressing that their decision regarding whether to include that photograph was an important one. After brief discussion among the students, Mr. Juster brought them to Principal Elefante's office, introducing them to the principal (who was new to the school) as the "editors" of the yearbook.

The principal told the group that he was interested in their opinion as to whether the photograph should be included in the yearbook, and he stressed that he would support their decision, whatever it might be. After about twenty minutes of discussion among the group (neither the principal nor the faculty advisor shared his view during the discussion), Mr. Elefante asked that a vote be taken, assuring the students that however they decided the issue, he would support their decision. Eight students voted not to publish the photograph, while two supported publishing it. Sometime later, at least one (and possibly both) of the dissenters changed her position slightly - she still thought the

5

photograph should be published, but acquiesced in the majority view for collegial reasons.

Blake, and his parents, assumed the decision not to publish the photograph had been made by Mr. Juster. They sought review by Mr. Elefante and the School District Superintendant, Mr. Greenberg. A meeting was scheduled with Mr. Elefante shortly after the decision had been made. Mr. and Mrs. Douglass expected Mr. Greenberg to attend as well, but only the principal was present. During that meeting, Blake's parents were told that the student editors decided against publishing the photograph. They asked for the names of the decision-makers, but Elefante declined to identify the students until parental permission could be obtained. Elefante, however, did tell Mr. and Mrs. Douglass that he supported the students' decision. Accordingly, Mr. and Mrs. Douglass took the matter to the school board. The board also supported the decision not to publish the photograph in the seniors section of the yearbook.

At some point following the yearbook conference, the student editors, at the suggestion of Erica Andrade (who had been named

Co-Editor-in-Chief), offered to publish Blake's photograph, as submitted, in a community sports section of the yearbook. But, that offer was rejected. This suit followed.

While it is clear from the testimony at trial that the student editors had differing levels of awareness of their official status at the time the vote was taken in Mr. Elefante's office - some knew they were "editors," some anticipated becoming editors, some thought they would be named editors, etc. - that ambivalence is understandable given both the informality that attends the yearbook club's activities, and the students' seeming association of the term "editor" with a specific job assignment (e.g., Photo Editor), rather than with a general policy-making role. The specific editorial jobs had not yet been assigned that early in the school year.

What is clear, though, is that the ten students who were asked to consider the matter on the morning of the yearbook conference, and who decided the issue in Principal Elefante's office, were in fact the student editors of the yearbook (two additional student editors were absent due to scheduling

7

conflicts).  They were not, as plaintiff's counsel asserts, randomly selected students who happened to agree with the administration's opposition to publication of Blake's photograph. Nor were they merely a serendipitous group of students who happened to sign up for a field trip to the yearbook conference. They were, de facto if not at that point de jure, editors of the yearbook.

It is also plain that the students were not coerced, unduly influenced, pressured, or even lobbied by the school administration to decide the matter as the administration might have liked.  The editors testified credibly that they were told that the decision was theirs, that they understood that their decision would be respected and supported, and that they were not pressured in any way.  And, they articulated rational reasons for the position they took.

While reasonable people might well disagree on the point, the students opposing publication generally thought it inappropriate to include a photograph in the seniors section that prominently displayed a firearm, given that firearms are

8

absolutely banned from school property.  One editor also expressed both an awareness of, and sensitivity to, the emotions and anxieties experienced by many following the Columbine High School tragedy, and similar incidents involving school shootings.

Of course, others might reasonably disagree - concluding that the photograph is entirely benign, even depicting the best of American youth - a clean-cut, smiling, healthy young man, exhibiting enthusiasm for the perfectly legitimate and well-recognized sport of skeet-shooting, as well as an obvious respect for the rules of safe-handling of perfectly legal firearms. Needless to say, target shooting, in various forms, is considered legitimate sport in our society.  The United States Olympic Committee recognizes the sport, it is sanctioned not only in high schools across this country, but in our best colleges and universities as well, and that activity certainly falls well within the ambit of respectable and socially-acceptable conduct.

The point here is not that the students' reasoning or their exercise of editorial judgment was necessarily correct or incorrect, on the merits.  As even the most cursory review of

9

just about any newspaper will disclose, reasonable people regularly disagree about the exercise of editorial reasoning and judgment. Rather, the point is that the editorial judgment in this case was exercised by the students, not the school administration, and their judgment was sufficiently independent to avoid attribution to the school administration.

I credit the testimony of Mr. Elefante, the school principal, and Mr. Juster, a faculty advisor, as well as the students who appeared. Mr. Elefante and Mr. Juster were unequivocal in asserting that the publication decision was committed to the students, and the students were assured that the school administration would support whatever decision they made. I do not mean to suggest that either Blake or his parents were not credible; their perceptions that the school administration controlled the decision were not unreasonable, given the contacts they had with Mr. Juster and Mr. Elefante, and given the nature of the appeals process, as well as the fact that school authorities of course retain a large measure of discretion to override such student decisions.

10

It is apparent, as well, given the record, that "state action" was not a concept on the minds of any of the parties before this litigation began. It is doubtful that either Blake or his parents, or school officials, focused very much on just who was deciding to exclude the photograph before suit was filed. Neither counsel briefed or even alluded to the issue on motion for preliminary relief, suggesting that they also had paid little attention to that critical detail. Indeed, the parties did not address the state action issue until the court brought it up at the hearing on preliminary injunctive relief. Therefore, I find it unlikely that either Mr. Elefante or the the Douglass family paid particular attention, pre-litigation, to the fact that the students actually made the controlling decision. So, although I find that Mr. Elefante did tell the Douglass family that it was a student decision, they can be excused for assuming it was, nevertheless, the faculty advisor's or principal's ultimate decision, because school authorities firmly stood by it, and, at the time, neither the principal nor the parents likely appreciated the significance of the point.

11

In any event, having carefully considered all of the evidence presented, I find that the student editors made the decision not to publish Blake's chosen photograph; the school administration did not. I find, as well, that the decision not to publish was one properly falling within the editorial function and discretion committed to the students by the administration. I also find that the students exercised independent judgment and discretion, that they were not coerced or unduly influenced by anyone acting under color of state law, and that their editorial decision is not attributable to the school administration. Finally, I conclude that the students were acting as private citizens, and did not make the decision to reject Blake's proposed photograph while "acting under color of state law."

As discussed in the earlier order on preliminary relief, the Court of Appeals for the First Circuit considered substantively identical issues in <u>Yeo v. Town of Lexington</u>, 131 F.3d 241, 248-49 (1st Cir. 1997). The Court of Appeals recognized that, in circumstances such as these, competing First Amendment rights are often at stake - in this case, for example, both Blake's right to expression and the First Amendment rights of student editors to

12

exercise editorial judgment, are at stake. Striking a balance between identical interests in <u>Yeo</u>, the court concluded that student editors of a public high school yearbook or newspaper are not "state actors" for First Amendment purposes, at least not when they exercise independent editorial discretion.

> Where, as here, there are First Amendment interests on both sides of the case, the analysis of whether there is state action must proceed with care and caution. Because the record establishes that the editorial judgment exercised was the independent judgment of the student editors of both [the school newspaper and the school yearbook], we resolve the question of state action against [finding that the students were state actors].

<u>Id.</u> at 255. In this case, too, the record evidence establishes that the editorial judgment exercised with respect to publishing Blake's photograph was indeed the independent judgment of the student editors. Accordingly, defendants are entitled to judgment on plaintiff's § 1983 claims given his failure to establish state action, an essential element, by a preponderance of the evidence.

13

## The Policy

It might be argued that, notwithstanding the earlier decision by the students, the subsequent and intervening enactment of a new school publications policy that effectively precluded publishing Blake's photograph in the yearbook, served to establish state action as the actual cause of Blake's alleged injury. The current publications policy was indeed adopted by the school board after the decision to exclude Blake's photograph had been made, and that policy was, by its terms, applicable to the current school year. The policy, as discussed in the earlier order, effectively precludes publication of Blake's photograph in the seniors section because it bans "props" (here, the shotgun, and perhaps Blake's attire) from any senior portrait. If it is the new policy, rather than the student editors' decision, that is keeping Blake's photograph out of the seniors section, then the state action element of his § 1983 claim is easily met, because the policy was developed and imposed by the School Board, plainly state actors.

But, as also explained in the earlier order, while the new policy does constitute state action, and would serve to preclude

14

publication of Blake's photograph, it is not subject to successful constitutional challenge. The new policy is broad and inflexible, but it is content and viewpoint neutral in both application and effect[1]. All students are affected equally; no senior may have a portrait published in the seniors section if it includes <u>any</u> prop, without regard to the content of any message the prop may convey.

Plaintiff also implies, but has not demonstrated, that the new yearbook policy is being enforced selectively, in an effort to single out his speech - the message conveyed by the content of his photograph - for special treatment. Mr. Elefante testified

---

[1] Although the distinction between content-based restrictions and those which are viewpoint-based is somewhat imprecise, <u>see, e.g.</u>, <u>Rosenberger v. Rector & Visitors of the Univ. of Va.</u>, 515 U.S. 819, 831 (1995), this much can be said with relative confidence: content-based restrictions tend to focus on the subject matter of speech, whereas viewpoint-based restrictions tend to focus on the speaker's perspective or opinion on a particular subject. Viewpoint-based restrictions on speech are, then, a subset of content-based restrictions. <u>See Id.</u> at 829 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.") (citation omitted).

15

previously that the new policy was applied even-handedly, and that two other seniors who, like Blake, submitted photographs of themselves posing with props, were notified that they would have to submit different portraits.  Both complied.

Plaintiff also suggests (but still has not presented supporting evidence or developed any legal argument) that because the policy was adopted shortly after he filed this suit, it necessarily (albeit only inferentially) constitutes an impermissible effort to stifle his constitutionally protected speech.  His argument seems to be that an otherwise viewpoint and content-neutral policy may, nevertheless, be unconstitutional, if its enactment was motivated by an intent to suppress his speech. If the court has accurately construed his claim, the evidence presented does not support it, and the applicable law appears to be otherwise.

As noted earlier, the general rule, as expressed by the Supreme Court, is that an illicit motive underlying the enactment of an otherwise valid and content-neutral regulation will not invalidate that regulation.

It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. As the Court long ago stated: "The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted."

United States v. O'Brien, 391 U.S. 367, 383 (1968) (quoting McCray v. United States, 195 U.S. 27, 56 (1904)). The Court of Appeals for the Seventh Circuit explained the principle's application when it noted that, "Just as we would never uphold a law with unconstitutional effect because its enactors were benignly motivated, an illicit intent behind an otherwise valid government action indicates nothing more than a failed attempt to violate the Constitution." Grossbaum v. Indianapolis-Marion County Bldg. Auth., 100 F.3d 1287, 1293 (7th Cir. 1996).

The court is aware of the Supreme Court's decision in Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788 (1985), which might seem to be at odds with (or, perhaps, describe an exception to) the general principle. There, the Court held that, "[t]he existence of reasonable grounds for

17

limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination." Id. 811. See also Ridley v. Mass. Bay Tansp. Auth., 390 F.3d 65, 77 (1st Cir. 2004) ("If [defendant] revised [its guidelines on the types of advertising it accepts] merely as a ruse for impermissible viewpoint discrimination, that would be found unconstitutional regardless of the type of forum created.").

Importantly, however, the Cornelius Court was concerned about the government's subjective motivations because that case involved a restriction on speech which was not content neutral. Under the policy challenged there, some entities wishing to raise funds for particular causes were permitted to participate in the government's charity drive, known as the Combined Federal Campaign, while others were not. That fact distinguishes Cornelius (and Ridley) from this case. The current Londonderry School District Yearbook Policy is both content and viewpoint neutral. The Court of Appeals for the Seventh Circuit explained the significance of the distinction in clear and succinct language:

18

> Because the government was distinguishing among groups based on the content of their messages (either advocacy or nonadvocacy), the [Cornelius] Court remanded the case to see whether the government was really targeting certain viewpoints.
>
> Where, however, the government enacts a content-neutral speech regulation for a nonpublic forum, there is no concern that the regulation is "in reality a facade for viewpoint-based discrimination." Whatever the intent of the government actors, all viewpoints will be treated equally because the regulation makes no distinctions based on the communicative nature or impact of the speech. A facade for viewpoint discrimination, in short, requires discrimination behind the facade (i.e., some viewpoints must be disadvantaged relative to other viewpoints). . . . When the government restricts speech in a content-neutral fashion, however, all viewpoints - from the Boy Scouts to the Hare Krishnas - receive the exact same treatment.

Grossbaum, 100 F.3d at 1298 (quoting Cornelius, 473 U.S. at 811) (emphasis supplied). So it is in this case. The new yearbook policy banning seniors from posing with any sort of props is blunt and far-reaching, but it is definitely content neutral. Accordingly, the school board members' subjective motivations in enacting that policy are not relevant, and cannot serve to undermine the policy even if their intent was as Blake presumes.

Finally, it probably bears noting that even if Blake could point to some authority supporting the view that a discriminatory motive underlying the school board's adoption of a content-neutral policy might still invalidate that policy, he has still failed to introduce any evidence, other than an inference arising from the timing of the board's decision to adopt the new policy, to support his claim that the board was specifically motivated by an intent to suppress his constitutional rights.  The direct evidence on that point particularly the testimony of Mr. Elefante, is that the board adopted the new policy so school administrators and faculty would not have to be involved in an annual task of weighing the relative appropriateness or inappropriateness of various props, costumes, or slogans that students attempted to include in their senior portraits.[2]

---

[2]  The United States Supreme Court has made clear that, with regard to student publications, schools "retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the shared values of a civilized social order, or to associate the school with any position other than neutrality on matters of political controversy."  Hazelwood Sch. Dist. v. Kuhlmeir, 484 U.S. 260, 272 (1988) (citation and internal punctuation omitted) (emphasis supplied).

While the controversy surrounding the publication of Blake's photograph undoubtedly prompted the school board to adopt the new policy, plaintiff has failed, on the merits, to prove by a preponderance of the evidence that the new policy is either a ruse or facade, actually designed to suppress his particular message.

## Conclusion

For the foregoing reasons, the court holds that defendants are entitled to judgment on plaintiff's First Amendment claim. Plaintiff's other federal and state claims (due process, equal protection, right to bear arms, free speech, etc.) were not pressed at trial, but, in any event, are either without legal merit or were not proven. The Clerk of Court shall enter judgment in favor of defendants in accordance with this order and close the case.

**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

March 17, 2005

cc: Penny S. Dean, Esq.
    Russell F. Hilliard, Esq.